If it please the court, my name is Michael Bigelow and I represent Bao Lu. We have decided that what we would do is argue seven minutes, seven minutes and six minutes. I'm going to try to discuss, unless the court leads me down a path I don't want to go, of course I'll follow. Very briefly, the juvenile issue speedy trial and then felony murder and the six minutes. Thank you, Your Honor. Do you want to start with jurisdiction? Juvenile jurisdiction? Yes. Yes. I am going to start with juvenile jurisdiction. And it seems to me that the proceedings in this matter began October 1999. The government cites U.S. v. Hayes and N. Ray Martin as the triggering date for jurisdiction as the initiation of criminal proceedings. The fact is, what they did is they dismissed the initial indictment and filed another indictment after the kid is 21 years old. After they found out? No. No. They found out years before, Your Honor. Years before. And let me tell you why they found out years before. In their opening brief, the government says they cite a litany of things that tells us why they knew this kid was a juvenile back in 1997. In their brief, he says, the government says, it starts in L.A. in February 1996. The government says they knew about his booking in Los Angeles. They knew about the complaint in Los Angeles. They knew about the charges in Los Angeles. They went down to Los Angeles. They interviewed the 11 PKI, as many as the 11 as many of the 11 PKI defendants as they possibly could. The government did. The FBI did. Mr. Wong did. Mr. Dupre did. In Los Angeles in 1957, they were following this case about as close they were following this case very closely. Excuse me. When was the first time that your client told the district court in the Eastern District of California what his true name was? The first time was about a week after his initial arraignment. I think that was in December. He said, I'm not. What's the other name? Jeffrey Staniels stood up and said, the federal defender appointed to represent him. The government characterizes it as a comment, Your Honor, an aside at podium. Jeffrey Staniels had been appointed to represent Bao Liu in the Eastern District. Jeffrey Staniels comes in about a week after the indictment. I think it was December. I want to say December 10th. I could be wrong on that date. But in December, and says, Your Honor, I wish to be relieved. I wish to be relieved because my client is a juvenile. We don't want to represent the juvenile in this capital case. We want to represent the adult. We are, therefore, asking this to be paneled out. I'm paraphrasing. Present at that hearing was Assistant United States Attorney Mikhail Rodriguez, who was Mr. Hite's co-counsel here, Mr. Hite's predecessor in interest to William Wong. William Wong has always been, as far as I know, the lead attorney in this. So what was the – let's assume that the government did, in fact, know prior to your client's 21st birthday what his true name was and that he, in fact, was a juvenile. What should they have done at that point? What they should have done is commenced an investigation, dropped everything, filed an information, began proceedings under the Act. If they had done that, it would have given counsel an opportunity to proceed under the Act. Now – Well, Mr. Bigell, I don't want you to waste your time on something that strikes me as irrelevant. Frivolous. How does that all bear on the second indictment? Does it bear on what, Your Honor? On the second indictment. The fact that the government didn't get around to the second indictment, he was indicted again. U.S. v. – well – What's wrong with the second indictment? The second indictment is identical to the first indictment. In a speedy trial context, in a speedy trial context – and this kind of thing hasn't happened before – but in a speedy context, speedy trial context, Feltman says that if you file – I think, I hope I've got this right – if you file a second indictment and it's identical to the first indictment, your speedy trial time is only told from the end of the beginning of the first indictment to the beginning of the second indictment. I'm sorry. No, there's no speedy trial argument here. My point is that it's the same, and it's done to subvert the Act. I mean – Now, what's subverting the Act? By the time the second indictment, he's no longer a juvenile, right? That's correct. And the Act says only the juvenile shall not be tried for a juvenile offense. He's no longer a juvenile. Except that proceedings began October 1999. That's the triggering event. So we let the government – we let the government just sort of willy-nilly, okay, he's turned 21 now. We won't worry about this. We'll wait until he's 21. If you had a speedy trial argument, we would worry about it, but you don't have one. But we've got prejudice because they didn't try him as a juvenile. Well, the government can wait and try him as an adult. What's wrong with that? I think that our citizenry demands more of the government. Why? I mean, why on earth? The statute doesn't require it. Well, I think the statute – It doesn't? Where does the statute require it? The statute requires that he be treated as a juvenile at the commencement of criminal proceedings. A juvenile should be tried for a juvenile offense. The government waits until he's an adult and tries him as an adult for a juvenile offense. But they didn't wait to try him. They began trying him in October of 1999. That didn't count. Well, if the Court says it didn't count, it didn't. I think it should have. Well, why should it count? If you had a speedy trial argument on that, you'd have something. But you don't have it, apparently. Well, I do make my speedy trial argument under the Sixth Amendment, and they delayed prosecuting him, which did, in fact, prejudice him. Oh. He was incarcerated as a juvenile in a – as a juvenile, he was incarcerated in adult confinement in Sacramento County Jail. He has – he fits all of the category – well, all but one of the categories for prejudice under speedy trial. He's had to wait for years to get – to get to trial, which sort of dovetails into the speedy trial thing. And that's why that has to do with my argument about whether Judge Shub was reasonable in permitting co-counsel to continually delay by not setting a briefing schedule. And that one I can't blame on Mr. William Wong. Mr. William Wong stood up on at least one occasion and impliedly on a number of occasions with me and said, let's set a briefing schedule, Judge. And the judge said, no, I can't set a briefing schedule because the Ninth Circuit will object to it if I do set a briefing schedule. And so, in fact, they're still making motions, new motions, in that same trial, which hasn't got a trial yet. But that's a whole other story. That's why – They could have, at the – whatever date they learned who Lew was and that he was a juvenile, at that point they could have tried him as a juvenile. That was an option. Severed and tried as a juvenile. They could have severed and proceeded against him as a juvenile. As a juvenile. Or they could have dismissed. Or they could have proceeded as a juvenile pending – during the pendency of the rest of the trial. And if they got a transfer, then joined him back up with the rest of it. Or they could have dismissed and referred the matter back to State court. Or dismissed and waited until he turned 21. You see, I disagree with – There may have been some speedy trial in relation to that, but it was something they could have done, right? But the dismissal is a subversion of the Speedy Trial Act. That's the point. It's a subversion of the Speedy Trial Act. They dismiss in order to gain a benefit. And I don't think – I submit to the court the government can't do that. You can't – you can't do an end run around and steal into college. Can I ask you one other question? Our questions have taken you into your co-counsel's time, and I'm sure Judge Reinhart will allow for that. Thank you. Between the time of your client's initial indictment and the ultimate trial and conviction, he was tried and convicted in State court for the PKI events or whatever it was in Los Angeles, right? No, Your Honor. No, because what happened in Los Angeles is he stood up and he said, I'm a juvenile in the middle of trial. He said, I'm a juvenile. That was one of the other points I was trying to make, by the way, is that the government is following him so closely. At some point, was he convicted in State court for his involvement in the PKI? Yes, that's correct. And that was prior to 1990 – the October 1999 indictment in the Eastern District. Under the statute, would he have been certifiable to be tried as an adult based on that? He was certified under 702 of the Welfare and Institutions Code in – I would have liked to have been able to make that argument. I have made that argument in cases that have been equally as grievous without a death in front of the same judge, and I've prevailed wherein he was not treated as an adult. I do not know. In fact, the government says at the beginning of its argument he would have absolutely been transferred, but at the conclusion of their argument, the government concedes that it is only likely that he would have been transferred. I would have liked to have had the opportunity to make that argument. Okay. And I did not. Okay. I think we're going to give your – Yes. Thank you. May it please the Court. My name is James Greiner. I represent San Von De Win. I'm going to argue a couple of things, but before I do that, I'm going to do two things. Number one, I'm going to address the Court and apologize for the inartful at times brief that I submitted. I'm not here trying to waste the Court's time. I will try to make clear my arguments and answer your questions. I'm going to address a couple of issues and leave those that I don't address just on the briefs because I think these are the important ones that this Court should look at in reversing or remanding the case. Number one is the 404B evidence issue. Number two is the instructional error and the alibi instruction. Number one, the 404B evidence issue. I'm requesting the Ninth Circuit reverse and remand back to the district court for a new trial because the 404B evidence that came in regarding – Judge Hawkins. No, no, no. Don't – you go until you hear me or one of the three of us. Because the evidence that came in regarding PKI in Los Angeles was not sufficiently similar under the case law to have it brought in the trial in front of Judge Shutt. Wasn't there an issue of identity in this trial? The government – Or some of the victims weren't able to identify who the perpetrators of the home invasion, et cetera, were. Judge Hawkins, I'm not sure that that's true. I think during the course of the trial, at least one witness identified, at least from the testimony, gave an identification to the jury of individuals. This wasn't an ironclad issue. You certainly didn't, from the defense side, concede it, correct? No, not conceding and certainly not conceding it here, especially with my client, because we had an alibi defense and we even had that jury question come back about does he have to be – So this was relevant to identity, but you say it's not sufficiently similar. Correct. And the reasons that I submit it's not sufficiently similar is that in PKI, there was no rope involved, no gloves involved, and the government uses that to convince the district court to allow it to come in in pretrial motion. In PKI, there were scanners. The type of crime in Los Angeles was not similar. But it involved the same group? It involved many members of the same group, correct. Were all of the persons involved in the jewelry store scenario that this case is involved with involved in the Los Angeles events? The answer is yes, isn't it? It is. It is. And that was, like this one, a surveillance of the owner of an enterprise with a plan to carjack, kidnap whatever, and get information to gain entry to a place of business, wasn't it? It was in the planning stages to the leaders, John Thatlong, Minh Nguyen, Van D, but that never got conveyed to the people that were circling the parking lot at PKI that were arrested. So whatever Van D and John Thatlong and Minh Nguyen planned, that information never made its way down to the people that got arrested in PKI. That's why I say it's not similar, because whatever my client and others in the parking lot got arrested for, they weren't doing the same thing as in Stockton. Stockton, from the defense standpoint, is a home invasion. In PKI, it's not a home invasion. They're in the parking lot going to do a burglary of PKI. That's a- They're conspirators, aren't they? Say it one more time. They're conspirators, aren't they? Correct. In both instances, absolutely correct. So they're liable for the acts of their co-conspirators? Absolutely. They are liable for co-conspirators. Let me quickly move on, because I don't want to take from Ms. Weston's time. The next issue is the instructional error. In this case, we're looking at a conspiracy to commit Hobbs Act robbery. The government is trying to uphold a jury conviction of murder without having an instruction regarding specific intent, even under the felony murder rule. And from the defense standpoint, that is erroneous. Let's assume that it's error. Why isn't it harmless in light of the evidence? It's not harmless because it deprived the defendants at trial both their due process and equal protection right of arguing to the jury alternative theories. Didn't intend to permanently deprive the jewelry store of its jewelry? There wasn't the specific intent instruction. Missing the specific intent instruction is what deprived the defense of being able to argue to the jury. It was almost like a moving target. Conspiracy to commit Hobbs Act robbery, robbery, home invasion, when in fact what it actually was was a burglary of a jewelry store, not an enumerated crime under Section 1111, which is really what the government was trying to fit. Plans to the house from the babysitter and the binding of people inside the house. All terrible acts, all crimes. Threat to kill of what, an 18-year-old, 8-year-old? I believe it was an 8-year-old. All terrible crimes, Judge Hawkins. However, it doesn't fit under the Section 1111. It doesn't fit under the specific intent instruction. And to get a murder conviction in the Ninth Circuit without specific intent, I submit, is reversible error. The final, and I'll be very, very brief because I know Miss Weston needs to talk, alibi. Here I think it points out what occurred at the trial level and why it should be reversed. The jury came back with a question regarding the alibi. Does my client need to be present to be convicted? Obviously the answer is no. As Judge Noonan has pointed out, conspirators are liable for co-conspirators. But what that does is it goes back to the instructional error regarding Section 1111, conspiracy, Hobbs Act, home invasion, robbery versus burglary of a jewelry store. My client's not there. He cannot be convicted of aiding and abetting because he isn't knowingly helping out any of the co-conspirators in the house. The jury believed the alibi defense at least to that question. Therefore, I submit, based upon the instructions, it should be reversed. I appreciate the opportunity. Thank you. May I please the Court? I'm Lindsay Weston. I'm a petitioner. I'm an attorney for Appellant T. Chan. I'd like first to address this Court's order issued last Thursday regarding Mr. Chan's notice to this Court or letter to this Court that he'd like to waive his appeal. This Court received it in mid-February. As this Court's aware, Mr. Chan wrote a letter to this Court in September asking and maybe he wrote to you. I don't know about the rest of the panel, but if you've conferred with your client and you are still the attorney of record and you're proceeding with this argument, that is good enough for me. Thank you, Your Honor. I did – I've seen my client five times. I last saw him on January 26th, and he gave me permission to proceed with the appeal. In light of this Court's order, I went downtown Sacramento in the rain yesterday morning to see him again, and the jail was closed for one to four hours because the computers were down. So – Well, I guess, again, if you're not the attorney after the argument or before the Court's decision, you'll tell us. I will. I'm – I'm going to address the Hobbs Act issue in this case. This – the home invasion robbery occurred over ten years ago, ten years and two months ago. There are still four defendants in this case who have yet to come to trial in the Eastern District on this particular case. One of the reasons is that what should have been a state court case has been made a federal case with all the attendant difficulties. And it's our position – clearly, Your Honors, and I can see this in our brief or my brief, there is concurrent jurisdiction on a number of state and federal issues in criminal cases. However, there are significant problems with Hobbs Act jurisdiction in this particular case. They are fact-intensive, and I'd like to argue those briefly. First of all, Your Honor, defense does concede that, and agrees, that if a business or an organization receives goods from out-of-state, that can be the basis for Hobbs Act jurisdiction. However, at some point, the interstate receipt of those goods becomes so attenuated that the jurisdictional hook is not there. The cases cited by the government in their response brief all have to do with situations in which a business received goods from an interstate supplier, and they were received from out-of-state. However, in this particular case, the gold that was received – and it wasn't received by Phnom Phich, Your Honor. The gold was received by Hong Thien – was highly attenuated. It came from Milpitas, and then it came from Amark, both of which were interstate sources. It could have come from Englehart, which was also an interstate source. And if – excuse me. A very fine judge of this court wrote an opinion that said that homegrown marijuana for medical purposes grown entirely within the state of California, for the personal use of someone who had an authorization from a physician under a law passed by the people of California, did not affect interstate commerce. And the United States Supreme Court smacked this down and went back to Wickard v. Filburn, the case where somebody was growing wheat or corn for their own consumption. Why – how unattenuated can you get? Well, Your Honor, I think that, as I mentioned in my brief, it's disturbing that there's no cases. There are very few cases where there is such a lack of jurisdiction that the court does not find Hobbs Act jurisdiction, and I think that this is one of the cases. Well, it's a recent case, United States v. Lynch, where the original panel found that it did not have the requisite impact on interstate commerce, and the court took it in bank and said that any impact, direct or indirect, is sufficient. You're familiar with Lynch? Yes, I am, Your Honor. I think there's three Lynches, and I think I've read all of them. I've also read the most recent one that the government cited in their letter today. Discussing Lynch briefly, of course, that started out to be a state court prosecution and then just went to federal court after the conviction in state court was reversed. I think that what we're looking at here is a business as opposed to the individual robbers that was really what was looked at in Lynch. We're also saying, Your Honor, in terms of the evidence in this case, that the government charged that nonfitch was the business that was involved in the interstate commerce when the evidence at trial, adduced by the government, was really that it was not nonfitch, but it was Hong Thiem, which was a separate business entity. I think the majority of the testimony, which was from Yves Hong, the brother of the victim in this case, was that the gold and diamonds in this case were purchased by a separate business entity, Hong Thiem and not Phnom Phich. That's cited to the record in my brief. Of all the individuals who testified for the government in terms of the jurisdictional aspect of this case, Yves Hong clearly had the most information about which entity was doing the purchasing. Yves Hong testified, again, that the gold and diamonds were purchased by a separate business entity with a separate business address, separate business books, and separate security. The government, realizing that they had significant problems with the interstate nature of the gold, then, mid-trial, introduced testimony that potentially gave an interstate commerce her through diamonds. But there's really a paucity of evidence, Your Honors, in this case, as to the interstate nature of those diamonds, meaning perhaps diamonds weren't mined in California after 1994, but there's no testimony as to where the diamonds were obtained, the source of them, and they could have been interstate in nature. Finally, and I think this is an important point, which was touched on briefly in my brief, but I think it's crucial in terms of whether or not there was an impact on interstate commerce. First of all, as I said, Hong Thien was really the purchasing agent and not Phnom Phich. Finally, what I was going to mention and bring up is that there was no evidence. This was not a robbery of a jewelry store. It was an attempted burglary of a jewelry store, and there was literally no evidence presented by the government as to what would have been found in the safe in the jewelry store. If Rob was going to go in midday and there's jewelry everywhere and there's money and there's gold, then clearly if that was Rob, there would have been some effect on interstate commerce. But in this case, there was no testimony as to what would have been found in the safe, which was the object of this burglary. The only person that gave testimony at all about the jewelry store or what might have been in it was Savutha Wai, the girlfriend of Van D. There was no testimony by Eve Hong. Of the babysitter? Yes. Eve Hong, Safforn Ork, the wife of the victim in this case, as to what would have been found in the safe. Your position, I understand it, is that if someone breaks into someone's home and holds a gun to the head of the wife of a bank president and says, I'm going to kill you unless you call your husband and tell him to withdraw money from the bank, that that's a burglary and not a robbery? Well, that's a robbery and it's a burglary, and as my counselor is saying behind me, it's an extortion. I think what's important about this, Your Honor, is that we're — Well, it surely is a robbery, isn't it, among other things? I'm going to allow Mr. Bigelow to say it's an extortion. But what we're looking at in this case, Your Honor, is that the government, in order to get federal jurisdiction here, has said that there's an impact, possible, potential, probable impact, on interstate commerce by the burglary or robbery, burglary of the jewelry store, which obviously was the safe. But there's no evidence as to what was in the safe, anything that was in the safe. And that's important. They never got in, right? They never got in. And that's important because the goal, which the government is basically saying, is the jurisdictional hook here was ordered by Hong Thiem next door. So the government has to show at least some possible, probable impact on interstate commerce, and I think that they did not do this in terms of the evidence. Now — I think — Go ahead. We'll give you one more minute. You've used over 10 minutes yourself, which is well over a third of your total time. I apologize, Your Honor. There was some testimony — We'll give you one more minute. Okay, thank you. I appreciate that. There is some testimony that, you know, PETA sold gold to Phnom Fitch, but the more significant testimony, the more relevant testimony, came from Yves Hong. So when you put together the attenuated nature of the gold, which is largely from inside of California, the fact that the gold actually went to Hong Thiem rather than Phnom Fitch and that there's no evidence presented as to what would have been taken from the jewelry store, such that there was any impact on interstate commerce, I think that the Hobbs Act jurisdiction failed. Thank you. Thank you. Good afternoon, Your Honor. My name is William Wong. I'm an assistant U.S. attorney from the Eastern District. Jason Hitt and I will split the time in answering these questions. Let me first start off by addressing comments by counsel that this is simply a jewelry store burglary. This can't be a burglary. If it was a burglary, they simply would have gone to the jewelry store and burglarized the jewelry store without going to the home and terrorized this family for over four hours. They brutalized this family for four hours, tortured them to extract information to get the alarm code and the safe combination and the keys to get into the jewelry store. Clearly, this is a Hobbs Act robbery. Secondly, Sabuthawai testified as to the fact there was lots of jewelry inside that jewelry store. They had made several trips to that jewelry store to see what was inside. They scoped out the jewelry store. So that doesn't hold water. Let me first start off by saying this. The indictment clearly charges the defendants with trying to rob property that's in the custody of the person. The possession or the custody, clearly in this case, like in a bank officer, is in the custody of the victim. The jewels that are inside the store is in the custody of Booth Hong. Their target was the jewelry store. Make no mistake about it. They wanted the jewelry store. If they wanted only a home invasion robbery, they simply would have gone there, robbed them of the items inside the home, and left. They would not have stayed there for four hours, torturing them with a blowtorch, an iron, and other implements of torture. As to the instructional error, I think there is a red herring here. The reason why there's a red herring is this. The defense that Song Van Nguyen proffered at trial was that he was not there. He asked and received an alibi instruction. His defense is he was not there. So how does specific intent play into that? Secondly, the remaining two defendants, T. Chan and Bao Liu, those two offered the defense that this is a home invasion robbery. They admitted the specific intent of taking items from the home, but this was not a Hobbs Act robbery. Therefore, if in fact the specific intent instruction was so important to them, they simply never argued it at trial. Now, let's look at what the Court did do. The Court did advise the jurors of the specific intent instruction. They gave the standard Hobbs Act robbery instruction. Right.  The Court stated the term robbery, as used in these instructions, means the unlawful taking. Well, what is the unlawful taking? It means the absence of mistake, the absence of accident, or some type of legal claim. Unlawful taking has to be with the specific intent to deprive. The unlawful taking or obtaining of personal property from the person or the presence of another against his will by means of actual or threatened force or violence or the fear of injury, immediate or future, to his person or property or property in his custody. There is some case law that points to the fact that the Hobbs Act was derived from the, I think, the State of New York Penal Code. Right. And there are cases out there, aren't there, that say that a specific intent instruction is required. There are cases that talk about that. And what we're saying here is the Court did, by use of the word, unlawfully take. That is specific intent. Furthermore, the Court went on. Normally, the specific intent instruction in the robbery context includes the language about the intent to permanently deprive, doesn't it? Well, if you – if you – Can you answer my question first? Yes. Doesn't the standard garden variety specific intent robbery instruction require language about the intent to permanently deprive? Yes. Under common law, that is correct, Your Honor. And under the New York Penal Code, which is recognized as a model upon which the Hobbs Act was derived? I believe so, Your Honor. But I believe in this particular case, it is harmless error, even if the Court finds that the word unlawfully does not comport to the extent required, because that's not their defense. That was not the defense at trial. They never argued that whatsoever. Secondly, in the Lilly case that they cite, in the Lilly case, the Court talks about if, in fact, in Lilly had the provision used the word feloniously, it would have sufficed. Now, feloniously and unlawfully equates to be pretty much the same effect. That is, the specific intent to do something unlawful. Now, it is clearly in this particular case harmless error on instructional error issue because not only the defendant argued alibi and the other defendants argued the home invasion robbery and not the Hobbs Act robbery. There are numerous cases, not from this circuit. I think there's at least three that I'm aware of. We cited two of them in the brief. There are numerous cases that allow the use of Hobbs Act robbery for 1111 purposes for felony murder. There are U.S. v. Wynn. That's cited in the brief. U.S. v. Williams. And the last one I just found, U.S. v. Pearson, that's at 159 Fed 430, which allowed the use of Hobbs Act robbery instruction just as the statute allowed, provided for. The last case you just cited in your brief? Pearson. The last one you just gave us the Fed citation for. Is it in your brief? No, it's not. When we're done, would you fill out a gum sheet? Yes, I will, Your Honor. Now, on the 404 issue, let me just speak quickly on that. The district court was clear when it ruled on the 404 that the reason why it was relevant and probative was because one or more of the defendants engaged themselves in a similar conspiracy in Los Angeles, knowing that they were doing was a robbery for the purpose of getting information, such as the combination to a safe, burglary alarm code, and or keys that would allow them to go into the business establishment and rob the business establishment. In both cases, the PKI and the stocking case, they were committed around between 5 and 6 o'clock. And the reason for that was the intent was to go and take the owner hostage, get that information, get the keys, and go back to the business establishment after it had closed. He did not want to have a situation where employees and customers were coming inside the building. Counsel is incorrect when she says that nobody knew the plan that was on the lower end, and only the hierarchy knew that. The testimony of Van Tien Van D was this plan was discussed among all of the defendants in both the PKI and the stocking case. Furthermore, in PKI, it was just two weeks after the stocking case. The composition of the robbery crew was about the same. The hierarchy of the leadership was similar. It required a hostage-taking. It was not a carjack to start with. It was a hostage-taking in the PKI. It wouldn't arrive because they saw surveillance cameras at the house, and that was testified to by Van D. And it was to occur after they closed the business. And the most important thing, what makes this a 404B, is the purpose for the undertaking. That was to extract the codes for the alarms and accommodation to the safe by use of the violence. I'm going to allow counsel to take the remainder of the time, Your Honor. May it please the Court. Good afternoon, Your Honor. My name is Jason Hitt. I'm an assistant U.S. attorney co-counsel on this case. I wanted to briefly address some of the issues in the remaining time. I wanted to start with the interstate commerce argument asserted by appellate counsel. And the one thing that I think is consistent throughout this appeal and even here today is the testimony of Yves Hong about his brother's activity in interstate and foreign commerce has never been addressed. It's undisputed that at trial, Yves Hong testified that the owner, his brother, the victim, the murder victim in this case, traveled to Cambodia with gold and jewelry, manufactured them in Cambodia because the labor was cheaper there. And then those items were brought back to Phnom Penh and then sold. The impact on interstate commerce can be both probable and, in this case, I think it's direct. And as Your Honor pointed out, the recent Lynch case spends quite a bit of time dealing with the broad scope of the Hobbs Act language. In particular, it cites to the U.S. Supreme Court's decisions in Sterone and Colbert and concludes that the Hobbs Act does indeed sweep with a broad stroke in terms of interstate commerce. Is the — not to deter you from your argument, but is the juvenile jurisdiction issue as it applies to Bao Lu on your plate? Yes, Your Honor. I can address that now. When did the government first have information that this individual might be a juvenile? Your Honor, as set forth, I would turn to the Court's attention to the — Tell us. Your Honor, the first time that the government, I believe, was aware, and I'd have to defer to Mr. Wong on the specifics because I was not part of the case at that point. But the first time that the government becomes aware is when the announcement in motion is made in court, I believe, is the first time. The argument asserted by — Just a minute. Counsel is corrected, isn't he? Mr. Bigelow is absolutely correct to say that at some earlier point, a potentially appointed public defender or someone of that nature stood up and said, we don't want this assignment. This guy's a juvenile. Your Honor, I don't think that's an accurate statement of the record. I think what the Federal defender said is there may be an issue, and the new counsel, Bob Peters, who was coming in as panel counsel, referenced to the Court, I'll get back to you, and as laid out in the government's brief, he then signs a stipulation and order as Wong Nguyen before then later filing the juvenile issue. In other words, the Court left it to the defense counsel because the Federal defender says there may be an issue about his age. Bob Peters says, I'll get back to you. And then the intervening events are essentially Wong Nguyen is Wong Nguyen until the filing of the motion. Wasn't this individual printed when he was arrested? Yes, Your Honor. And actually, he was arrested and booked and signed a booking sheet as Wong Nguyen. And the problem is that his name, if you look at all of the facts known to the government or at least, as Mr. Bigelow asserts, assuming through the 120,000 pages that are available, the government has information on an individual it knows as Wong Nguyen. The information about Bao Lu actually indicates it's someone who looks different in size, and weight. He's, I think, 5'4 and 90 pounds. Didn't the government use both names in the indictment? I'm sorry? Did not the government use both names in the indictment? In the original indictment, yes, Your Honor. I believe the government did include both names. The understanding of Bao Lu. Yes, Your Honor. But I think the issue here. Doing that, what efforts did the government make to determine the age of Bao Lu? Your Honor, I think that the efforts that are laid out in the government's brief are that essentially, if you weigh all the facts known, most of the facts lead to Wong Nguyen and then the defendant in court, who, as Mr. Bigelow points out, in March of 1997, apparently in a sealed proceeding, stands up and indicates to a court he knows full well how to address a court, say, I'm a juvenile through my attorney. He gets to federal court and he does none of that. He goes in and essentially misleads the district court and the government throughout the proceeding, and he's the one in the best position to know his own identity. And for Mr. Bigelow to suggest that the government is in a position that's unique to know this information, I think, is not really supported by the facts because this defendant was very cunning, very sophisticated, and interestingly, the timing of his announcement in court, I think the inference is he believed he'd hit a safe harbor. He'd hit 21, and now the government can't take any action against him while obscuring this from the district court. And a ruling in his favor on this jurisdictional issue, I think, would encourage defendants essentially to lie to district court judges and put a district court judge in the position of trying to figure out everyone's true identity, and I don't think that that's appropriate. And as you had pointed out earlier in Mr. Bigelow's argument, anything, if it were known to the government at that time, I think there's a very good chance, in fact, that without a doubt the government would pursue for transfer to adult proceedings. It had already happened in L.A. County, and a state judge had decided an adult sentence and an adult treatment under the criminal justice system was appropriate. There's nothing in the record suggesting this wouldn't have been Ballou's fate as well, that he would be treated in the federal system as an adult. In addition, I don't believe it's in the briefs, but he had also been convicted of manslaughter in Santa Clara County and sentenced to an adult sentence after L.A. and before the federal system, so the government would have had quite a bit of evidence to present at the time of any hypothetical juvenile proceeding had Mr. Lou been forthcoming with his identity. I also wanted to briefly address, unless the Court has more questions on juvenile status, on 404B I think it was asked of one of the defense counsel whether identity was an issue in the case, and there was sort of a convoluted answer, but I think it's fairly straightforward that identity was an issue in this trial, and you can look at Mr. Chan's opening brief at page 10, where it essentially is asserted that identity was part of the issue and part of the defense in this case. And finally, on instruction, if anything in this case, I think the additional Hobbs Act element of interstate commerce, different from common law robbery, may have afforded these defendants additional process because it essentially was the focus of most of their defense, in addition to the plan was a home invasion, was that interstate commerce was not met. And the record in this case is abundantly clear, Your Honor, that NOMPIC did engage in both interstate and foreign commerce, and for those reasons I think each of the defendants' sentences and convictions should be upheld. Thank you, counsel. Yes, you have a little time left. Your Honor, I was there when we indicted the case. The defendant was indicted under an AKA of Bao Lu only because his rap sheet showed that he had used the name Bao Lu, but the description, the physical description of Bao Lu was 4 foot 10 and 90 pounds, while the defendant was 5 foot 5, 130 pounds, which fits the Hong Lin description. When he was arrested at PKI, he had a driver's license under Hong Lin. He was charged in Los Angeles under the name Hong Lin. He was found in state prison when we took him out of state prison. He had been convicted of killing a 16-year-old girl in Santa Clara County, was doing a 17-year sentence for that. He was doing a 13-year sentence at PKI for the attempted burglary and robbery of that particular case. So if this case had gone to a transfer type of hearing in district court, the district court hearing these facts about the defendant would not have – I don't think the court would have found him to be amenable to juvenile treatment. He's going to do his time in adult court and state court first and then brought to Federal court when he is in the age of close to 40 in order to do his juvenile time. I don't think that's a realistic possibility. Under the statute with that kind of a prior record, what is the procedure? Do you certify the individual to the court? You file a motion to the court asking that the defendant be tried as an adult. It's similar to the 707 proceeding that's in the state court. And at that time, the court will consider all the factors of the defendant, his background, as well as the crime that he's charged with in the present case. And it's not mandatory, though? It's not mandatory that the court transfer him. But in this particular case, in light of his background, it was a likely probability. Yes. Thank you. Okay. Thank you all. We've had extensive argument. The case just argued.
judges: Reinhardt, Noonan, Hawkins